2021 IL App (1st) 180523-U

SIXTH DIVISION
September 3, 2021

No. 1-18-0523

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 16035 |
| | ) | |
| ANGELO CLARK, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CONNORS delivered the judgment of the court.
Justice Harris concurred in the judgment.
Presiding Justice Mikva concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:    Defendant's convictions for aggravated battery based on discharge of a firearm are affirmed over his contentions that 1) his statement should be suppressed because he was arrested pursuant to an investigative alert; 2) the trial court erred because it violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); and 3) the trial court denied him due process and a fair trial because it conveyed to the jury that it was biased against him by suggesting he had an improper motive during cross-examination and because it allowed lay witnesses to testify as to their opinion that he was a "lookout." The trial court's sentence was not an abuse of discretion.

¶ 2    Following a jury trial, defendant Angelo Clark was found guilty of two counts of aggravated battery based on discharge of a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) under an accountability theory. The court sentenced defendant to 16 years in prison on each count, to be served consecutively. Defendant contends on appeal that: 1) his statement should be suppressed because he was arrested pursuant to an investigative alert, not an arrest warrant; 2) the trial court committed plain error because it failed to ask the jurors whether they accepted the principles set forth in Illinois Supreme Court Rule 431(b) (eff. Jul. 1, 2012); 3) the trial court denied him due process and a fair trial because it conveyed to the jury that it was biased against him by suggesting he had an improper motive during cross-examination; 4) the trial court denied him due process and a fair trial when it allowed lay witnesses to testify as to their opinion that he was a "lookout"; and 5) the trial court failed to consider the requisite sentencing factors when it sentenced defendant, who was 17 years old, to a total of 32 years in prison. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant's convictions arose from a shooting that took place near the area of 311 West 105th Street, in Chicago, during the evening of July 19, 2013, in which two victims, a 6-year-old girl and 52-year-old woman, were shot and injured. At trial, the State proceeded on three counts of aggravated battery and five counts of attempted first degree murder (720 ILCS 5/9-1(a)(1) (West 2012) (720 ILCS 5/8-4(a) (West 2012)) against defendant based on an accountability theory. Co-defendants, Terrence Lynom and Ladon Barker, were tried separately and are not parties to this appeal.

¶ 5                    A. Motion to Quash Arrest and Suppress Evidence

¶ 6    Before trial, defendant filed a motion to quash arrest and suppress evidence, contending that he was arrested without probable cause and a valid arrest warrant.

¶ 7    At the hearing on the motion, Lashan Clark, defendant's mother, testified for defendant as follows.[1] On July 22, 2013, Lashan was at her mother's house when two police officers arrived looking for defendant, who was living at Lashan's sister's house. Lashan voluntarily accompanied the officers to her sister's house. When they arrived, Lashan walked to the back of the house and told the officers to wait outside. Lashan walked through the back door and saw defendant sitting at the kitchen table. Lashan told defendant that the police were there "about a little girl" and it was serious. When Lashan and defendant were talking, the officers entered the house without permission. The officers then choked defendant, threw him against the wall, and threatened to taser him.

¶ 8    Chicago police officer Patrick Kinney[2] testified that on July 22, 2013, he and his partner, Chicago police officer Kevin O'Neill, learned that there was an investigative alert for defendant and that "there was probable cause attached to that investigative alert." Kinney testified that there were two types of investigative alerts, one being with probable cause and one without probable cause. He testified that "according to my data warehouse search of the alert it said specifically probable cause to arrest." He testified that the basis for probable cause for the investigative alert was that defendant had been "positively identified as being the shooter where two victims were shot."

---

[1] Lashan Clark shares the same last name as defendant. We will therefore refer to Lashan Clark by her first name.

[2] The report of proceedings spells Officer Kinney's name as "Kenny" but the parties and the arrest report contained in the common law record spell his name "Kinney."

¶ 9    After Kinney learned that there was an investigative alert with probable cause to arrest defendant, he performed a search on defendant's name and went to the residence of the first address that appeared. At that residence, defendant's mother, Lashan Clark, was "extremely" cooperative and informed them that defendant lived with her sister. Lashan accompanied the officers to her sister's house. When they arrived, Kinney went to the back of the residence, O'Neill went to the front, and Lashan waited in the police car. Kinney knocked on the back door. A man, who was about 20 or 25 years old, answered the door and Kinney told him that he was looking for defendant and had probable cause for his arrest. The man opened the door, moved to the side, and pointed to a back bedroom where Kinney saw defendant. Kinney, who was outside the residence, told defendant that he had a probable cause investigative alert for his arrest and asked him to come to the police station. Defendant said, "Okay, let me get some clothes," after which Kinney entered the residence and defendant put on his clothes. Kinney did not have consent to go inside the house and he entered the residence because he did not "know what [defendant] was going to grab" and "wanted to have eyes on prior to me arresting him." The State then asked, "And was he cooperative and then came out with you?" Kinney testified, "Yes, very." The State then asked Kinney, "Then you placed him under arrest?" and he responded, "That's correct." Kinney then brought him to the police station. Kinney did not have an arrest warrant for defendant.

¶ 10    The trial court denied defendant's motion to quash arrest and suppress evidence. In doing so, the court found that Kinney was "believable" and a "compelling" witness and that Lashan's testimony was "utterly without any credibility." The court stated that it agreed with defense counsel that "the existence of an investigative alert with probable cause to arrest does not offer an officer the ability to enter a home to effect an arrest on that point." The court further stated that

Kinney's eventual entry occurred after defendant had "already agreed to accompany" the officers and it was not "to effect arrest but to effect and facilitate his accompaniment, which he already agreed to do."

¶ 11                                    B. Motion to Suppress Statements

¶ 12    Defendant also filed a motion to suppress the statements he made after he was arrested. He argued that the court should suppress his statements because of his young age, he was never given *Miranda* warnings, and his statements were obtained as a result of psychological and mental coercion.

¶ 13    Chicago police detective Matthew Weber testified that on July 19, 2013, he was assigned to investigate the shooting, which had occurred at 311 West 105th Street, in Chicago, with Chicago police detectives Henry Barsch and Tom Lieber. On July 22, 2013, at about 5 p.m., Weber and Lieber met with defendant at the police station. When Weber initially entered the interview room, he introduced himself and explained why defendant was there. Defendant told Weber he did not "know anything" and was not in any gangs. Weber did not give defendant *Miranda* rights at this time and did not ask him any questions. Weber left the room "briefly" and then returned to the room, at which time he read defendant his *Miranda* rights. Defendant indicated he understood each of his rights and agreed to speak with Weber and Lieber, after which they spoke for about 30 or 40 minutes.

¶ 14    Weber left the interview room with defendant and then at about 1 a.m., he called Assistant State's Attorney (ASA) Patricia Melin. Thereafter, Weber and Melin spoke with defendant. Melin advised defendant of his rights and defendant indicated he understood his rights and agreed to speak. At some point during the conversation, when Melin and defendant were in the room without

- 5 -

Weber, defendant agreed to give a handwritten statement. Thereafter, Weber, defendant, and Melin went to a larger interview room where defendant gave his statement and Melin typed it. When defendant finished his statement, Weber, Melin, and defendant reviewed it, signed each page, and initialed any corrections. Defendant read a portion of his statement, which demonstrated to Weber that defendant was able to read and write English.

¶ 15    Weber testified that defendant was given a cheeseburger and a Snickers bar, and he did not want anything to drink. Defendant was allowed to use the bathroom and make a telephone call. Defendant never asked for an attorney or to make any phone calls. Weber did not offer defendant anything in exchange for his statement and did not make any threats or promises to him. Weber did not tell defendant that if defendant did not help him, he was going to be charged with murder.

¶ 16    Defendant, who was 17 years old on July 22, 2013, testified that the "arresting officer" came into the back of his aunt's house without consent or a search warrant. The officer then grabbed him and asked for his name. Defendant gave the officer his name, after which the officer told defendant that he was taking him to the station for questioning. Defendant told the officer that he did not want to go to the station. The officer then pulled out a taser, placed handcuffs on defendant, and took him to the police station where he was placed in a small room. About an hour later, defendant was taken into an interrogation room. Defendant testified that the detective who had previously testified at the hearing came into the room and asked defendant what happened. Defendant told the detective that "I don't know nothing about anything." The detective left the room and about 30 to 35 minutes later, he returned with two other officers. Defendant told the officers that he did not "know nothing about nothing" and the officers continued to interrogate him. Defendant eventually gave a statement. The detective never read defendant his *Miranda*

warnings and defendant was never told that he had a right to a lawyer or the right not to talk. Defendant gave a statement because the detective told him that if he did not say he participated in the crime, he would be charged with first degree murder.

¶ 17    After defendant gave his statement to the detective, he met with an ASA in a different room. The ASA never told him that he had a right to an attorney or that he had a right not to talk to them. Defendant knew certain details that he provided in his statement because it was "the word around the neighborhood." Asked why he told the police "what the word around the neighborhood was," he testified that "they told me if I didn't say I participated in this crime, I'd be charged with first-degree murder" and "I only did what I was told." Defendant testified that he signed the statement and read it because that "that's what you have to do" and the detective told him that "if I didn't say I participate in this crime, I would be charged with first degree murder." He never told the ASA that he did not want a lawyer or that he did not have a problem talking to them. He was not allowed to make a phone call to his mother or aunt.

¶ 18    On cross-examination, defendant acknowledged that his mother brought the police to the location where he was arrested. Defendant stated that he never asked for an attorney or to make a phone call. He acknowledged he signed a handwritten statement regarding the shooting, his signature was on pages one and three of the statement, and he initialed it three times. He acknowledged that he said in the statement that the police and ASA treated him okay, he was given a cheeseburger and Snickers bar, and he was allowed to use the bathroom. He acknowledged that after the ASA finished typing his statement, he demonstrated he could read by reading a portion of it out loud.

¶ 19    Following argument, the court denied defendant's motion to suppress statements. In doing so, the court found that defendant "freely admitted reading" the statement, which contained *Miranda* warnings. The court stated that it was "readily apparent to me that these are his words and that these words were given to the police not as a result of duress or coercion of any kind, but a decision he made freely and voluntarily" after having been given his *Miranda* warnings.

¶ 20                                    C. Jury Trial

¶ 21    Juannakee Kennedy, the mother of the six-year-old victim Q.T., testified that on July 19, 2013, Q.T. attended a barbeque with her older daughter. At about 10 p.m. that night, she learned that Q.T. had been shot in the back, the bullet went through her lung, and she was unconscious in the intensive care unit at the hospital. Q.T.'s right lobe of her lung had to be removed and she was in the hospital for about three weeks.

¶ 22    Lisa Travis testified that on July 19, 2013, at about 7:30 p.m., she was attending a memorial for her nephew, who had died five years earlier. The memorial was held at a residence located at 311 West 105th Place in Chicago, with mostly women and some children. At some point, she fell to the ground and could not feel her foot. Her niece said, "They shooting," and everybody started running into the house. She did not hear shots and did not see anybody shooting. She tried to scoot herself into the gangway area to hide and it was "chaotic" for a few moments. After the bullets stopped, her son carried her into the house. Travis was shot in the leg, which required therapy and caused her to miss six months of work.

¶ 23    Ayanna Moore testified that on July 19, 2013, she was at 311 West 105th Street to attend the memorial with about 20 or 30 people.[3] At about 7 p.m., she left the memorial with her sister to get more cups. When Ayanna stopped her car at a nearby intersection on 105th Street, she saw an individual named Kevin Collins, whom she referred to as "Cool," and he stopped to talk to her from the passenger's side of her vehicle. Ayanna noticed a group of about 10 guys whom she had not seen before. At some point when she was talking to Cool, a guy with dreadlocks and a red t-shirt, who was about five to seven feet from her, walked up and lifted his shirt so she could see the butt of a gun tucked into his waistband. Cool told the individual to "like go back" and he dropped his shirt and walked away. Ayanna continued driving to the store and called her cousin, Jarvis Thomas, to find out if "they were having some conflict" because she was suspicious about Cool and the other individuals.

¶ 24    Ayanna testified that about 15 or 20 minutes later, she returned to the memorial. When she was on the porch, she looked down the street towards a dead end on the block and saw "three guys" come from an alley onto 105th Street. The three individuals were in red, black, and white t-shirts and she recognized all three of them from her encounter with Cool earlier that evening. The person in the red shirt was the same person whom she had previously seen with the gun, and she identified defendant in court as the individual who was in the white shirt. The individuals in the red and black shirts ran across the street and "started shooting" and "holding the guns out." They were shooting towards the people in front of the residence at 311 West 105th place. In front of the house were about 15 to 20 people, most of whom were women and children.

---

[3] Ayanna Moore shares the same last name as another other witness Shusana Moore. Therefore, we will refer to these witnesses by their first names.

¶ 25    Ayanna testified that defendant did not have a gun and he "came out behind them," "laid back," and stood "off to the side." She also testified that defendant was standing "a little off from them" in the alley and was "just standing there the whole time." She stated that defendant "walked like right behind them and then he looked and walked back" to the alley right before the shooting started. After the shooting stopped, the individuals ran down the alley towards 106th Street. At some point during the shooting, Ayanna saw Q.T. get hit while she was riding her bike, after which Q.T. ran towards the porch and collapsed in Ayanna's lap. Ayanna tried to stop the bleeding and stayed with Q.T. until the ambulance arrived.

¶ 26    Ayanna identified one of the shooters from a photo array that the detectives had showed her at the police station after the shooting. She testified that on July 21, 2012, when she was at the hospital with Q.T., she identified from a photo array the shooters in red and black shirts, as well as the person who was "just a lookout." The State then asked Ayanna, "So when you say the lookout, are you referring to the person—well, who is the person that you identified as a lookout?" Defense counsel objected to the word "lookout," and the court sustained the objection. Ayanna then testified that the person whom she had just identified was defendant and he was the person who had been standing by the alley.

¶ 27    Ayanna testified that on July 22, 2013, at a line-up at a police station she identified the shooter, who was wearing a red shirt, and defendant, who she described as "being a lookout.". The court overruled defendant's objection. Ayanna then testified that after she viewed the lineup, she went back to the detective and told him that the person she had previously identified in the "first array" "wasn't the one that was the lookout." Defense counsel objected to the word "lookout," after which the court admonished the jury as follows:

"THE COURT: Okay. Folks, I'm going to take a minute and pause on the word lookout. Whether or not the defendant was a lookout in this case, that's going to be your decision and your decision alone to make. This witness is testifying on her own impressions of what was going on out there. That's something you can consider but the decision of guilt or innocence of the defendant rests solely within you and it's based on your observations of the witnesses. Does everybody understand that?"

The jury responded affirmatively, and the court stated it was "going to sustain the objection, as to the use of the word lookout."

¶ 28    Ayanna testified that on July 23, 2013, she viewed another lineup at the police station, where she identified the shooter who had the "blond patch" in his hair and the person who was wearing the red shirt. Ayanna identified a photograph of the porch where she was standing on the night of the shooting, and she placed a mark where defendant and the two shooters were standing.

¶ 29    On cross-examination, Ayanna acknowledged that after the shooting, she told the detectives that the person who showed her the firearm was wearing a black shirt, but at trial, she testified that he was wearing a red shirt. She testified that when she spoke with the detectives after the shooting, she "might have said a lot" because "it happened so fast" and it was "kind of chaotic." There were about 7 to 10 return shots fired at the shooters.

¶ 30    Shushana Moore testified that on June 19, 2013, she was at the memorial and at about 7 p.m. she went to her aunt's house, which was located on the same street. When she was standing in front of her aunt's house, she saw Ayanna in her car at the intersection at 105th and Wentworth, which was about 50 feet away from her. Ayanna was talking to "Cool" and there were other young guys with him. During the conversation, a young man who was wearing a red shirt and had

dreadlocks turned towards Cool, lifted up his shirt, and pointed to a gun in his waistband, which was poking out. Cool shook his head "no." About 30 or 45 minutes later, Shushana went to the store with her aunt. On her way there, she turned into an alley on 105th Street and saw about 7 to 10 guys in a nearby field, one of whom she had previously seen wearing the red shirt with the gun. She also saw a person in a black shirt who had a "patch of hair that was dyed blond" and a person in a white shirt, whom she identified in court as defendant. Shushana's aunt called her mother to warn her that the group of guys "looked suspicious." Shushana then heard about 10 gunshots. She drove back to the memorial and saw a child, whom she later learned was Q.T., crawling up the stairs to the house.

¶ 31    Shushana further testified that on July 22, 2013, she viewed a line up at the police station and identified defendant as the person with the white shirt in the field who "was standing out there with them." She also identified the person with the red shirt and the gun in his pants. On July 23, 2013, she viewed another line up at the police station and identified the individual with the "gold hair patch" whom she saw in the field.

¶ 32    Jarvis Thomas testified that he was currently living in Nevada, where he had a pending armed robbery case, and further stated as follows. On July 19, 2013, at 7:30 p.m., he was at the memorial and noticed "two guys walking out the alley" from the south side of the street. One of the men was wearing a red shirt and the other was wearing a black shirt. A third man, whom he identified in court as defendant, was in a white shirt and kneeling down by the gate on the south side of the street. He testified that when the men in the red and black shirts crossed the street, defendant "[j]ust stand there and look and observe." After the two men crossed the street, "gunshots started ringing out" and the men in the red and black shirts were shooting towards the

- 12 -

crowd of people on the north side of the street. There were about 12 or 13 gunshots, and someone shot back at the men who were shooting. Defendant never crossed the street and was "[s]till standing there" and "kneeling down" the entire time and only stood up when the shooters left. After the shooting stopped, the men crossed the street and went back to the alley. Defendant waited for them and then he "stood up, and they all took off in the same direction."

¶ 33    At one point during Thomas's testimony, he was asked what defendant was doing when the men in the red and black shirts were shooting. Thomas testified that defendant was "[k]neeling by the gate," after which the following colloquy occurred:

"MR. NOLAN [(ASSIATANT STATE'S ATTORNEY)]: Okay. And what did he appear to be doing while the people were shooting? Just kneeling?

MS. PATZKE [(DEFENSE ATTORNEY]: Objection—

THE WITNESS: Observing—

MS. PATZKE:—asked and answered.

THE WITNESS: Observing the surroundings—

THE COURT: Overruled.

MS. PATZKE: Objection.

THE WITNESS:— and the shooters' lookout.

THE COURT: Overruled."

¶ 34    The court then told the jury: "As I've already explained, folks, the role of the parties is for you to determine based on your observations of the witnesses." The State asked Thomas what led him to the opinion that defendant was "observing." Thomas testified that he "was looking around" towards the people on the block and not towards the shooters and his eyes were focused primarily

on the block. On re-cross, Jarvis testified that defendant was just looking towards the party and not looking back the other way towards the alley. He also testified that defendant was not looking at the shooters and agreed that he "wasn't looking around, he was looking in one place." The State showed Thomas a photograph of the street where the shooting took place and he described where he was standing when the gunshots started. On July 21, 2013, he identified defendant in a photo array as well as the two shooters. On July 22, 2013, he identified defendant and one of the shooters in a line up and the next day he identified the other shooter in a lineup.

¶ 35    Cragg Hardaway testified he did not remember where he was at 7 p.m. on the night of the shooting. However, he did remember that at some point that evening, he was with his cousin, Isaiah Hicks, at his grandmother's house at 105th and Edbrooke. He eventually left his grandmother's house with Hicks and drove towards Michigan Avenue. At around 105th and Lafayette, DeAndre Butler got into the car and Hardaway drove around the neighborhood for a little bit. The police stopped him near 105th and State Street. He did not remember if someone had jumped out of the car before the police stopped him. The officers took the occupants' names and let them go, whereupon Hardaway drove back to his grandmother's house with Hicks and Butler.

¶ 36    When he was asked whether it was "true that you heard multiple gunshots when you walked out of grandma's house," Hardaway stated he could not remember, after which defense counsel objected based on a leading question. The court then stated it was granting the State leave to treat him as a hostile witness based on his "repeated and very pointed indications of not recollecting." Hardaway then testified that right after he picked up Butler in his car, he picked up Barker, Lynom, and defendant.

¶ 37    Hardaway further stated that on July 21, 2013, he met with two detectives at the police station and his conversation was recorded. He had a pending armed robbery case at the time. A few weeks before Hardaway testified at trial, he watched the video recording of his interview. Hardaway testified that the detectives tried "to put me in something" and told him he was going to prison for 25 years for something he did not do.

¶ 38    Hardaway did not remember certain statements he made during the interview. Hardaway did not remember telling the detectives that at about 7:40 p.m. on the night of the shooting, he walked to the gate of his grandmother's house and heard multiple gunshots "up towards the hill," that Lynom, whom he knew as "Little Lord," was wearing a red shirt and that defendant was wearing a gray shirt when they got in his car that night. He remembered telling the police that defendant had exited his vehicle at 105th and Lafayette, Barker had exited the vehicle around 106th and Wabash, and Lynom jumped out of his car right before the police pulled him over. He did not remember telling the detectives that defendant had said to Lynom, "I saw you shoot someone" and "I know someone's dead." He did not recall whether he told the police that when he returned to his grandmother's house, he got out of the car with Butler and Hicks and walked back up the hill, where he ran into defendant, who had changed clothes. He did not recall whether he told the police that he heard defendant tell Butler that he had thrown the guns by a field near the train tracks. Hardaway testified that at the end of the recorded interview, he stated that he was treated well by the police and he gave the interview freely and voluntarily.

¶ 39    After Hardaway stated that he did not remember the questions or answers from his grand jury testimony, Hardaway stated that when he gave his statement to the police and testified at the grand jury proceeding, he "told them what they wanted to hear."

¶ 40　John Dillon, who was an ASA in July 2013, testified that he met with Hardaway before he testified at the grand jury proceeding and he asked Hardaway questions at the proceeding. The State read portions of the State's questions and Hardaway's answers from the grand jury proceeding and Dillon answered affirmatively that the portions the State read were the State's questions and Hardaway's answers from that proceeding. We summarize that testimony as follows. When Hardaway stepped outside his grandmother's house, he heard about 12 gunshots coming from "up the hill." Hicks, who was sitting in the car, did not hear the gunshots because his music was loud. Defendant said to Lynom, "I saw you shoot someone." While Hardaway was driving, Lynom told him to stop the car and then Lynom got out of the car and jogged though a gangway, after which a police car pulled over Hardaway. The officers asked for their names and questioned why the guy with the red shirt, which was Lynom, had exited. Thereafter, a second police car pulled over Hardaway and let the men go after taking their names and searching the car. When Hardaway returned to his grandmother's house, he walked up the hill on 105th Street towards Michigan Avenue with Hicks and Butler. They ran into defendant, who had changed his clothes, and defendant told Butler that he threw the guns "back by the train tracks" near a field on 106th Street. The police and ASA treated Hardaway well and did not threaten him. Hardaway gave the videotaped statement freely and voluntarily.

¶ 41　Chicago police detective Henry Barsch testified that at the police station on July 20, 2013, Hardaway agreed to have his statement recorded. In his statement, Hardaway identified a photograph of Hicks as the person sitting in the car when the gunshots went off, Lynom as the person he picked up in the area of the shooting, and Barker as one of the people who fled the area of the shooting. Hardaway identified a photograph of defendant as the person "who was also part

of the shooters." Barsch never told Hardaway that he would receive 25 years in prison if Hardaway did not tell him what he wanted to hear. After Barsch's conversation with Hardaway, the detectives issued investigate alerts for defendant, Lynom, and Barker, after which defendant was arrested on July 22, 2013. The court allowed the State to publish certain portions of Hardaway's statement.

¶ 42 Assistant state's attorney Patricia Melin testified that on July 23, 2013, she and Weber met with defendant at the police station. She explained her role and advised defendant of his *Miranda* warnings. Defendant indicated he understood each of his rights and agreed to speak to her. The initial conversation lasted between 30 and 45 minutes and defendant told Melin he had been treated fine by the police. Defendant agreed to give a typed written statement, so Melin, Weber, and defendant went to another room with a computer. When Melin finished typing defendant's statement, she reviewed it line by line with defendant and Weber. Defendant read a portion of the statement out loud to demonstrate that he understood and could read and write English. Defendant, Melin, and Weber signed each page of the statement and defendant was allowed to make corrections. The court admitted defendant's statement into evidence and the State published it.

¶ 43 Melin read defendant's statement to the jury, which we summarize as follows. He was advised of his *Miranda* rights, understood each of his rights, and agreed to make a statement. He was 17 years old and was a member of "Goon Town," which was a mix of people from different gangs. Goon Town was fighting with the "10-4 L." On July 19, 2013, defendant was with "some other Goontowns," including Lynom, Barker, Butler, Kevin Collins, whom he called "Cool," and a person named Maris Oliver. They saw a group of 10-4 Ls down the block "so they decided to go around to the other end of the block and shoot back at the people" who were having a gathering with about 30 people in front of a house. Defendant stated that Barker and Lynom "volunteered to

- 17 -

shoot" and that he and Oliver said they would "go with to make sure [Barker] and [Lynom] were ok." Defendant, Oliver, Lynom, and Butler, who brought guns to the scene, walked by the train tracks through an alley to the other end of the block at 105th and Wentworth. Oliver stayed close to the alley and defendant, Barker, and Lynom walked to the corner of the alley. Defendant stayed at the corner of the alley and Barker and Lynom crossed the street and started shooting at the group in front of the house. While they were shooting, defendant "stayed at the edge of the alley to make sure they were ok." Defendant stated that Barker "was holding his gun in both hands when he fired, it looked like he knew what he was doing, but [Lynom] was firing with one hand up, and his hand was moving around like the gun was too big to be fired like that." After Barker and Lynom "shot down the block," defendant saw that "someone from down the block fired two times back towards them, but he saw the bullets ricochet on the ground in front of them." Barker and Lynom ran back to defendant and then "they all ran back the same way to 106th, and there Maris took both guns." Defendant, Lynom, and Barker kept running until they got into a car with Hardaway, Hicks, and Butler. At 105th and Lafayette, defendant got out and went to his grandmother's house. Defendant changed his clothes because "he knew that a person on the porch at 105th and Wentworth had seen him." Defendant walked somewhere with his cousin, and saw Butler, Hardaway, Hicks, and Lynom there. Some people were telling Lynom that "he had shot a kid" and someone punched Lynom because he "shot a little girl." Defendant stated that he "decided that he was going to get the 9-millimeter gun back" and bring it back to where it was usually kept. Defendant "did go get the gun, but not on that day." Defendant stated that he had been treated well by the police and had been given a cheeseburger and Snickers bar and was allowed to use the bathroom. Defendant stated that he gave his statement freely and voluntarily and he demonstrated his ability to read and write in English by reading part of his statement out loud.

¶ 44    Chicago police sergeant Kevin Norris, an evidence technician, testified that he found several fired cartridge cases of two different calibers on the street, sidewalk, and parkway near the shooting. He concluded that there were at least two guns that were fired. Two semi-automatic firearms were recovered from the roof of a nearby garage. Caryn Tucker, who was an expert in firearms identification, testified that the firearms inventoried included two 9-milimeter guns, one Ruger, and one Browning. Three of the cartridge casings that she examined were recovered from the street and were fired from the Browning firearm. Nine other cartridge casings she examined were fired from the same unknown firearm and seven cartridge cases were identified as being fired from the same unknown .40-caliber Smith and Wesson firearm. She did not identify any cartridge casings that were fired by the recovered Ruger firearm.

¶ 45    Lashan Clark, defendant's mother, testified for the defense. Lashan's testimony was similar to her testimony at the hearing on defendant's motion to quash and arrest and suppress evidence. She testified that on July 22, 2013, she was at her mother's house when two police officers came looking for defendant. The officers allowed Lashan to ride with them to her sister's house to find him. Lashan entered the back of her sister's house and the police officer initially stayed on the porch. Lashan spoke with defendant, who saw the officer and became upset. Lashan tried to calm defendant down. The officer entered the house and told defendant they were not going to wait for him to get dressed. Defendant told the officer he was not going, after which the officer grabbed defendant, told him he was going to taser him, and dragged him out of the house.

¶ 46    Defendant, who was 17 years old on the night of the shooting, testified that on July 22, 2013, he was in the back bedroom of his aunt's house when his mother walked in and closed the door behind her. A police officer was on the back porch and there were police officers in the front

- 19 -

and back of the house. After he talked to his mother, one of the officers walked into the house and asked defendant to come to the police station. After defendant refused, the officer grabbed defendant by the wrist, forcefully pulled him up, slammed him into the door, and put a taser in the back of his neck and threatened to tase him. Defendant testified he complied with the arrest and the officers took him to a police station.

¶ 47 At the police station, defendant, who was in handcuffs, was taken to a small room. About 45 minutes later, Detective Weber came in and told him that Hardaway placed him at the scene of the crime. Weber never told defendant that he did not have to talk or that he had the right to a lawyer. Defendant told Weber that he did not want to talk to him, he did not know what he was talking about, and he did not "know anything about nothing." Weber started yelling and screaming at him and left the room. Thirty minutes later, Weber told defendant that if he did not say he had anything to do with the crime then he would "be going down for first degree murder." Defendant decided to talk to Weber because he "was scared out of his f*** mind."

¶ 48 Defense counsel asked defendant about the statement that the ASA had read and how defendant knew about the specific things included in the statement. Defendant responded that his grandmother lived around the area of the shooting, and everyone knew what had happened because "word get around fast where I'm from." Asked why he told the detectives that he was involved in the shooting, defendant testified that the detective told him "if I didn't say that I was there, I was going to be charged with first degree murder" and the detective told him he could go home after he gave the statement.

¶ 49 On cross-examination, defendant testified that Goon Town was "a bunch of guys that *** grew up with each other." Lynom, who defendant had known for about a year before the shooting,

was involved in Goon Town with defendant. Defendant knew Barker from "around the neighborhood" and had also known him for about a year before the shooting. He testified that Goon Town was not a street gang. Asked whether he had told the ASA and the detectives that Goon Town and the 10-4 Ls had been fighting, he testified that his statement was dictated by the ASA and Weber, after which the following colloquy occurred:

"Q. Well, didn't you tell the Assistant State's Attorney and the detectives that they had never gotten along, that they had been fighting since before you were even involved?

A. You know as well as I know that that statement was dictated by Detective Weber and the State's Attorney.

Q. I don't know that. And we'll go through that.

A. Yes, you do.

THE COURT: Listen. I'm going to warn you once. All right?

THE DEFENDANT: Yes.

THE COURT: You hear me?

THE DEFENDANT: I understand you, Judge Ford. Yes.

THE COURT: I'm treating you with all the respect I can muster. You're going to listen to the questions—sir, can you pause for a minute. You're going to listen to the questions and answer the ones posed. You can't interject anything into them. Okay. Just listen and answer the questions—

THE DEFENDANT: I understand that."

¶ 50    The State then asked defendant about the night of July 19, 2013. Defendant testified that at about 6 p.m., he was playing Xbox at his grandmother's house. At around 8:15 or 8:30 p.m., he

went outside and saw a group of people hanging out. He did not hear gunshots. At some point that evening, defendant saw Hardaway and Hicks when they pulled up their car at 104th and Wabash. The State showed defendant his statement and he acknowledged that his signature was on page one. He testified that he gave his statement "not voluntarily." Defendant testified about the statement and court sustained several of the State's objections based on defendant being nonresponsive.

¶ 51    Defendant acknowledged that his statement indicated that in July 2013, he moved back to Chicago after he was expelled from a high school in Wisconsin. He acknowledged he told the ASA that Lynom and Barker volunteered to shoot at the memorial and that he "went over there to make sure that they were okay." He acknowledged stating that he stayed close to the alley at 105th Street while Barker and Lynom went across the street and started shooting and that he said he was "there to make sure that your guys were okay." During a series of questions with defendant about whether Weber had told defendant to state that Barker had a gun in both hands, the following colloquy occurred:

"Q. Did Detective Weber tell you to say that [Barker] had the gun in both hands?

A. Detective Weber told me that.

Q. Did Detective Weber—

A. You're trying to confuse me. You're not going to get—you know as I know that this statement is involuntary.

MS. KREMIN [(ASSISTANT STATE'S ATTORNEY)]: Objection. Nonresponsive.

THE COURT: Folks, we're going to go over something right now. All of that that he just said, That's not evidence. There was no question pending. It's an effort by the defendant

to do, I don't know what. But it's not responsive to the question and he can't do it and you can't consider it. Does everybody understand that?

THE JURORS: Yes.

THE COURT: Do you understand that when a question is asked of you, it's your duty just to answer it, my friend?

THE DEFENDANT: Yes.

THE COURT: The just blurting things out, that's not allowed in a court of law. Do you understand that? Yes or no?

THE DEFENDANT: Yes, I do, Judge Ford."

¶ 52    Defense counsel then requested a side bar and, outside the presence of the jury, defense counsel moved for a mistrial "based upon what you said about what the defendant—you don't know what he's trying to do, but he's trying to do it, for the record." The court stated that defendant had been "consistently failing to answer questions as posed" and it had been "fairly patient with him, asking him to just respond to the questions as posed." The court stated it would make a clarification for the jury, after which the court admonished the jury as follows:

> "The defense has pointed out, and I agree, that as I've been talking to [defendant] about what's been going on out here, I indicated that there was a certain—he said, I think, a couple sentences that were really not in response to any question. I want you to understand, he can—that you just can't consider that in any way. I have no knowledge of what—completely what he said because it was nonresponsive, but you can't consider it unless it's a response to a question. Does everybody understand that?"

The jurors responded, "Yes," and then the court stated:

"That's the long and the short of it. He gets to say whatever he wants. He can be reexamined by his own attorneys if they choose, and they're not required to choose to do so. And the State is also allowed to ask questions that they may ask. That's within their job title also. And that's the purpose of this. But what any witness, and this applies to any of the witnesses that have testified during the course of the trial, has a duty to do is answer the question when posed. That's one of the rules that we've got here. Does everybody understand that?"

The jury responded "Yes," after which the court asked the jury: "And do you all promise not to consider any remarks that I made as it relates to [defendant's] remarks in any way in reaching whatever verdict you reach?" The jury responded, "Yes."

¶ 53    The State then continued its cross-examination. Defendant testified that Weber told him to say that Lynom and Barker volunteered to shoot. At one point during the questioning regarding what Weber had told him to say, the court sustained defense counsel's objection based on a question being asked and answered, after which defendant attempted to answer the question. The court stated that the objection was sustained and there was no question pending and then told defendant, "Have a seat, my friend. *** For the record, [defendant] stood up, faced the deputy sheriff and became obstreperous. Don't consider any of that either. Everybody understand that?" The jurors responded, "Yes." The court told defendant that the State would continue asking him questions and defendant responded, "Judge Ford, I don't have nothing to say. I don't." The court told defendant that they would continue, and defendant responded again that "I don't—I have nothing to say. I have nothing to say."

¶ 54    The court explained to the jury that defendant testified on direct examination, which exposed him to cross-examination. Thereafter, asked whether Weber had told him to state that he stayed at the edge of the alley to make sure Lynom and Barker were okay, he responded: "I don't have anything to say." The court sustained the State's objection based on being nonresponsive. Defendant then stated: "You're going to say the same thing. I'm going to give you the same reply every time. I don't have anything to say. It's over with. They made their minds up already." The court told the jurors: "Folks, I'm certain that none of you have made your minds up already; is that correct?" The jurors responded, "Yes." The court then explained to the jurors that the court "will rule on the objections" and "[i]t's your duty as a juror that we swore an oath originally that you may not consider the guilt or innocence of the defendant until after you've heard the arguments of the attorneys."

¶ 55    The State asked defendant about whether Weber had told him to say certain statements during his interview with the ASA and defendant responded, "I don't have anything to say." Asked whether he told Weber that someone from down the block had fired back towards them two times, defendant responded, "I don't have anything to say." The State objected again based on being nonresponsive, after which the court stated:

> "Folks, I just want to make one clarification. That objection is sustained. When the defendant chose to testify, which he did, he testified through an entire direct and answered the questions posed by his attorney, he waives his Fifth Amendment right against self-prosecution—against self-incrimination. Do you understand that? And it is appropriate and allowable for the State to cross-examine him once he's waived his right against self-incrimination. Does everybody understand that?"

The jurors responded, "Yes."

¶ 56    Shortly thereafter, outside the presence of the jury, the court told defendant that he could hold him in contempt for failing to answer the questions and if he continued to refuse to answer questions during cross-exanimation, the court could strike his testimony and instruct the jury not to consider anything he said. Defense counsel moved for a second mistrial based on one juror having raised his hand during the court's admonishments. The court questioned the juror, who indicated he could be fair and had not made up his mind, and the court denied defendant's motion for a mistrial.

¶ 57    Thereafter, the State continued its cross-examination regarding defendant's statement. Defendant testified that his "whole statement is made up." On re-direct, defendant testified that he made up the statement because he wanted to go home.

¶ 58    Defense counsel entered stipulations between the parties that in the grand jury proceedings, Shushana had testified that the gunshots "were coming from the memorial" and that Ayanna had testified that the individual who pulled up his shirt and showed the gun when she was talking to "Cool" was about 20 feet away from her.

¶ 59    In the State's rebuttal, the State called Detective Kinney.[4] Kinney testified that on July 22, 2013, he and his partner, Officer O'Neill, learned that there was an investigative alert for defendant. He went to the last known address listed in the Chicago Police Department database. Defendant's mother answered the door and told him that defendant was most likely at her sister's

_____

[4] At the February 2016 hearing on the motion to quash arrest, Detective Kinney was an officer but at trial he was a detective.

house and that she would take them there. Kinney and O'Neill drove their police vehicle to defendant's aunt's house with defendant's mother, who was very friendly and helpful.

¶ 60 When Kinney arrived at defendant's aunt's house, he parked the car in the front and then walked to the back of the residence. O'Neill stayed in the front and defendant's mother stayed in the car. There were no other police officers there. Kinney knocked on the back door and a man answered the door. After Kinney explained why he was there, the man moved his body and pointed at defendant, who was standing in a room about five to seven feet away. Kinney told defendant that they had an investigative alert for him and that the detectives wanted to talk to him at the police station. Kinney allowed defendant to put on a shirt, at which point Kinney walked in the house and stood there. Kinney testified that he was not asked to come inside the house, but he walked inside "for safety" and to "just see where his hands were reaching to make sure he didn't pull a weapon out on me." After defendant put on his shirt and shoes, he came out willingly and did not struggle. Kinney placed defendant in handcuffs outside the back door and did not grab his wrist, throw him against the wall, or place a taser on him.

¶ 61 The State also called Detective Weber in rebuttal, who testified as follows. On July 22, 2013, at about 5:30 p.m., he and Detective Lieber met with defendant at the police station. The ASA and Weber both advised defendant of his *Miranda* rights before each of them met with defendant. Defendant indicated that he understood his rights and agreed to talk. Weber never threatened defendant that he would charge him with first degree murder if he did not answer any questions or if he did not put himself at the scene. Weber never told defendant what to say and did not tell defendant that he could go home if he gave a statement. According to Weber, defendant stated that he had participated in the shooting. Asked to give a summary of what defendant told

him, Weber testified that "basically, he was a lookout" and "was standing in the alley so he could watch anybody coming and keep an eye on his two guys." Weber testified that defendant told him he was involved in disposing of the guns after the shooting and that "I think he volunteered to take the guns and put them back where they belonged." Defendant never told Weber that he was at his grandmother's house with his cousin during the shooting.

¶ 62     On cross-examination, Weber admitted that although defendant told him where he had placed the guns, Weber could not find them after searching the location for hours. Defense counsel asked Weber, "You talked several times about [defendant] telling you that he was a lookout; correct?" Weber responded, "Correct." Weber testified that the word "lookout" does not appear in defendant's handwritten statement. On redirect, Weber testified that in his statement, defendant recalled that while they were shooting, defendant "stayed at the edge of the alley to make sure they were okay." Later, the State asked Weber what he understood defendant's role to be based on what defendant told him and Weber testified that "he was a lookout."

¶ 63                    D. Closing Argument and Deliberations

¶ 64     In closing argument, the State argued that defendant was accountable for Barker and Lynom's actions because he was "the lookout" and "agreed to go with them to make sure that he's [*sic*] okay." Defense counsel argued that the State did not prove that defendant had the requisite intent and asserted that the only time the jury heard the word "lookout" was from the State's witnesses, which was their opinion and not based on anything reasonable.

¶ 65     Following argument, the jury began deliberating at 5:30 p.m. on Wednesday July 12, 2017. At 9:25 p.m. that day, the jurors were sequestered until the next morning and then began deliberating again. At about 12:40 p.m. that day, the court received a note from the jury that

requested the grand jury transcripts from the witnesses who testified at trial and a copy of the transcript from the first day of the trial. At about 4:35 p.m. that same day, the jury requested a transcript from the trial proceedings that took place on another day of the trial, and the court informed the jury they would get the requested transcripts as soon as they were available. The jury had also reached a verdict on two counts, but was deadlocked on the other counts. Following agreement with the parties, the court gave the jury a *Prim* instruction, after which the jury deliberated for four more hours. The next day, the jury deliberated for nine hours. Thereafter, the jury found defendant guilty of two counts of aggravated battery with a firearm and the court declared a mistrial on the remaining counts.

¶ 66    The court subsequently denied defendant's motion for new trial. Defense counsel also orally informed the court that she filed a motion for remand to the juvenile court and argued that defendant should be sentenced as a juvenile, noting that he had turned 17 years old nine days before the shooting. The court denied defendant's motion.

¶ 67                                    E. Sentencing

¶ 68    At sentencing, the State read the victim impact statement of Lisa Travis, who stated that the shooting "forever changed my life" and caused physical pain and mental stress. She depended on others to help care for herself and could not work for six months, which caused financial hardship. The State also read a victim statement from Q.T., the six-year old girl who was shot. Q.T. stated that she could not enjoy athletic activities like she did before the shooting. She had just finished kindergarten before the shooting, and she hoped defendant would "stay in jail where you belong for a very long time so you won't ever help your friends hurt someone else again." Juannakee Kennedy, Q.T.'s mother, testified that her family was affected in many ways after the

shooting, and she requested the court to sentence defendant "to a sufficient amount of time" so that "he truly pays for his participation in the near death experience that my daughter endured."

¶ 69    The State argued in aggravation that in June 2013, defendant had a finding of delinquency for aggravated assault and unlawful use of a weapon and that, just over a month later, he was involved in the shooting here. The State argued that defendant was still denying responsibility for his actions. The State asserted that the shooting affected Q.T. and caused her physical and mental suffering. The State requested the court to sentence defendant to a "long period of time."

¶ 70    In mitigation, defense counsel argued that defendant was "just a child," never had the opportunity to go to high school because he was working when he was 15 years old, and "was only a little over 10 years older than the victim." Counsel stated that defendant had a "tough life" and grew up without his dad in his life. Counsel noted that defendant was depressed in 2011 and tried "to kill himself" when he was 15 years old. Counsel stated that he was not trying to make excuses for defendant, but requested the court to be lenient because defendant was a child and had just turned 17 years old before the shooting. Counsel stated that defendant "did not have direction" and "no one to show him the way" and requested that "be factored in greatly" for sentencing.

¶ 71    In allocution, defendant wrote a letter that defense counsel read to the court and stated as follows. He was a "changed person" and was "no longer that reckless 17 year old kid." He was now "a humble young man evolving into a grown man over time of my incarceration" and had a lot of time to evaluate himself. He stated that he thought about the offense "that caused two innocent people pain and suffering every night plus my family," he was "better than this," and he had "to live with this for the rest of my life." Defendant stated that "[b]elieve it or not, I am truly sorry for that happening. Now I understand. I have to be mindful of who I surround myself with

and what type of actions I take part in." His mentors were "willing to get me a job, to get me back in school" and he "made a promise to myself that I'm done with the act." Defendant stated that he was "past my adolescent state of mind," had "developed into a mature adult," and had learned his lesson. Defendant requested the court to give him "a second chance at life" and he told the court he was "also making a promise to you that if you give me a second chance, you won't regret it." Defendant requested the minimum sentence and stated that "I want to make something of myself while I still have a chance. Every word that I read is true. You have my word as a man."

¶ 72    The court sentenced defendant to 23 years in prison for each count of aggravated battery with a firearm, to be served consecutively. In doing so, the court stated that it considered the evidence presented at trial, the presentence investigation report (PSI), which it "reviewed in its entirety," the evidence offered in mitigation and aggravation, the statutory factors in aggravation and mitigation, the attorneys' arguments, the victim impact statements, and defendant's allocution. The court stated that it was "fully familiar" with the evidence presented at trial and it was very mindful of the financial impact of incarceration. The court stated that it listened to defendant's statement, which provided "some degree of optimism," but also made "me even sadder that this decision that he made he became involved in this group and participate in this offense changed the course of his life substantially." The court stated that "I can't eschew the extreme gravity of their conduct" and the sentence had to "reflect the seriousness of the conduct."

¶ 73    Following the court's pronouncement of the sentence, defense counsel orally requested a motion to reconsider, arguing that the sentence was excessive, "greatly" above the minimum, and that defendant was "very young" at the time of the offense. The court denied defendant's motion to reconsider the sentence. In doing so, the court stated it was "mindful" of defendant's "youth,"

- 31 -

but "the magnitude of these offenses because there's two victims involved here and the concerted effort they engaged in to cause the injuries."

¶ 74                          F. Amended Motion to Reconsider Sentence

¶ 75    On January 8, 2016, defendant filed an amended motion to reconsider the sentence. Defendant argued his sentence was excessive in light of his background, young age, and the nature of his participation in the offense, including that he never fired a gun. Defendant asserted that the 46-year sentence eliminated any opportunity for rehabilitation.

¶ 76    At a subsequent hearing on the motion, defense counsel argued that a 46-year sentence for a 17-year-old was "akin to a life sentence" and that defendant did not have background, was not the shooter, and was only found guilty of aggravated battery with a firearm, not attempted murder. Defense counsel argued that defendant had just turned 17 years old at the time of the shooting and that the long sentence "for such a young man with no background leaves absolutely no chance at all for rehabilitation." Counsel stated that there was no evidence to show that defendant shot a gun and requested the court give defendant "a chance to actually have some impact on society for the good, to show that he's learned what he has done wrong." Defense counsel requested the minimum sentence.

¶ 77    Ultimately, the court resentenced defendant to consecutive prison terms of 16 years in prison for each count of aggravated battery with a firearm, for a total of 32 years. In doing so, the court stated: "I am mindful of the fact that he is a young person. I've taken that into further account. I don't often grant motions to reconsider sentences, but this one is one that I continued to mull, even after the sentence had been issued in the case." This appeal followed.

¶ 78                                II. ANALYSIS

¶ 79                              A. Investigative Alert

¶ 80    Defendant first contends that his statement should be suppressed because he was arrested pursuant to an investigative alert, not a warrant based on probable cause. Defendant asserts that under *People v. Bass*, 2019 IL App (1st) 160640, ¶¶ 62, 71, when a defendant is arrested pursuant solely to an investigative alert, the arrest violates the Illinois Constitution. He also asserts that under *Bass*, the failure to obtain an arrest warrant violates the Illinois Constitution. Defendant argues that because he was arrested pursuant to an investigative alert and not an arrest warrant, his arrest was unconstitutional. Defendant further asserts that the constitutional violation was not harmless because the case was close and without defendant's statement, the evidence at trial only showed that he was present in the area of the shooting. He also claims that his statement was the only evidence suggesting he knew the others were armed and planned on shooting as well as the only evidence that he agreed to go with the others to the scene to see that they were "okay." He argues the court erred when it denied his motion to quash arrest and suppress evidence and requests that we reverse and remand the matter for a new trial.

¶ 81    When we review a trial court's ruling on a motion to suppress, we review the court's factual findings for clear error and will only reject those findings if they are against the manifest weight of the evidence. *People v. Bass*, 2021 IL 125434, ¶ 21. However, we review *de novo* the trial court's ultimate ruling on a motion to suppress. *Id*. The defendant bears the burden of proof. *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 49. Once the defendant sets forth a *prima facie* case that the seizure was unreasonable, the burden shifts to the State to provide evidence to rebut it. *Bass*, 2021 IL 125434, ¶ 21. When a defendant is arrested without probable cause or a warrant based on

probable cause, both the United States and Illinois constitutions are violated. *Simmons*, 2020 IL App (1st) 170650, ¶ 49.

¶ 82     Here, Officer Kinney testified at the motion to suppress hearing that on July 22, 2013, there was an investigative alert for defendant with probable cause attached to it and that according to a "data warehouse search of the alert it said specifically probable cause to arrest." Defendant does not argue on appeal that the officers did not have probable cause to arrest him. Rather, defendant argues that his arrest was unconstitutional because he was arrested pursuant to an investigative alert and not an arrest warrant.

¶ 83     Defendant relies on the appellate court opinion in *People v. Bass*, 2019 IL App (1st) 160640, ¶¶ 62, 71, *aff'd in part and vacated in part*, 2021 IL 125434, ¶ 34. In *Bass*, the defendant was arrested pursuant to an investigative alert based on probable cause, as here, and a divided panel of the appellate court concluded that the defendant's motion to suppress should have been granted because arrests based solely on investigative alerts, even if the alert is based on probable cause, violate the Illinois Constitution. *Id.* ¶¶ 7, 42, 71. After the briefing was completed in this case, in April 2021, our supreme court issued an opinion in *Bass,* in which it agreed with the appellate court that the defendant's motion to suppress should have been granted, but it reached that conclusion on narrower grounds, finding that the traffic stop at issue was unconstitutionally extended. *Bass*, 2021 IL 125434, ¶ 26. Because the court decided the case on narrow grounds regarding the legality of the traffic stop, it did not address the constitutional issue regarding whether investigative alerts violate the Illinois Constitution, and it vacated the portions of the appellate opinion relating to investigatory alerts. *Id.* ¶¶ 29, 33; see *People v. Little*, 2021 IL App (1st) 181984, ¶ 63.

¶ 84 Thus, because the supreme court has vacated the portions of *Bass* regarding the constitutionality of investigative alerts, we will not follow those portions of the appellate court opinion. Rather, we will follow other panels of this court that have concluded that investigative alerts do not violate the Illinois constitution. See *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39; *Simmons*, 2020 IL App (1st) 170650, ¶ 64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50; *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 63. Accordingly, we are unpersuaded by defendant's argument that his arrest was unconstitutional because he was arrested pursuant to an investigative alert and not an arrest warrant. The trial court did not err when it denied defendant's motion to suppress.

¶ 85 B. Illinois Supreme Court Rule 431(b)

¶ 86 Defendant next contends that the trial court committed plain error when it failed to ask the jurors whether they both understood and accepted the four principles set forth in Illinois Supreme Court Rule 431(b) (eff. Jul. 1, 2012) that are necessary for a fair and impartial trial. Defendant asserts that the trial court asked the potential jurors whether they took "issue" or "struggle[d]" with those principles and that, therefore, it did not comply with Rule 431(b) because it failed to ascertain whether the jurors accepted the principles set forth in the rule.

¶ 87 Initially, we note that defendant acknowledges he did not preserve the issue for review because he did not object at trial or include it in his posttrial motion. See *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50 (to preserve an alleged error for review, a defendant must object at trial and raise the issue in a posttrial motion). Defendant nevertheless asserts that we should review his challenge under the plain error doctrine, which provides that we may review unpreserved error if (1) "the evidence is so closely balanced that error alone threatened to tip the scales of justice

- 35 -

against the defendant" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The defendant has the burden of persuasion under both prongs. *People v. Wilmington,* 2013 IL 112938, ¶ 43. Before we apply the plain error doctrine, we must first determine whether any error occurred at all. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 88    Rule 431(b) states as follows:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: 1) that the defendant is presumed innocent of the charge(s) against him or her; 2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; 3) that the defendant is not required to offer any evidence on his or her own behalf; and 4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. Jul. 1, 2012).

The rule "requires that the trial court ask potential jurors whether they *understand* and *accept* the enumerated principles." (Emphasis in original.) *Wilmington*, 2013 IL 112938, ¶ 32. The trial court may conduct the questioning either individually or in a group, "but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *People v. Thompson,* 238 Ill. 2d 598, 607 (2010).

¶ 89    Here, defendant argues, the State concedes, and we agree that the trial court violated Rule 431(b). The trial court asked the potential jurors whether they understood the four principles, but it did not ask whether they accepted each principle. Instead, with respect to the first principle, it

asked whether they "struggle[d]" with it and, with respect to the other three principles, it asked whether they had or took "issue" with them. Accordingly, we find that the trial court did not comply with Rule 431(b) because it did not ask the potential jurors whether they both understood and accepted the four enumerated principles. See *People v. Sebby*, 2017 IL 119445, ¶ 49 (concluding that the trial court erred when it asked the potential jurors whether they "had any problems with" or "believed in" the principles, noting that the "rule requires the trial court to ask potential jurors whether they understand and accept" the four principles).

¶ 90 Defendant urges review of the error under the first prong of the plain error doctrine because the evidence was closely balanced. To determine whether the evidence was closely balanced, we must review the totality of the evidence and conduct a qualitative, commonsense assessment of the evidence within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53. "Our analysis involves an assessment of the evidence on the elements of the charged offense, along with any evidence regarding the credibility of the witnesses." *Id.* A defendant must show that the evidence at trial was so closely balanced that the "error alone tipped the scales toward a guilty verdict." *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 49. It is a defendant's burden to show that the case was closely balanced. *Piatkowski*, 225 Ill. 2d at 567. We conclude that defendant's challenge fails under the first prong of the plain error doctrine because the evidence was not closely balanced. The trial court's violation of Rule 431 did not alone tip the scales toward the jury finding defendant guilty on two counts of aggravated battery based on discharge of a firearm.

¶ 91 Defendant was convicted of two counts of aggravated battery based on discharge of a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) under an accountability theory (720 ILCS 5/5-2(c) (West 2012)). A person is guilty of aggravated battery of discharge of a firearm if he or she

"[d]ischarges a firearm, other than a machine gun or a firearm equipped with a silencer, and causes any injury to another person." 720 ILCS 5/12-3.05(e)(1) (West 2012). A person is legally accountable for the conduct of another when before or during the commission of an offense and with the intent to promote or facilitate that commission, he solicits, aids, abets, agrees, or attempts to aid the other person in planning or committing the offense. 720 ILCS 5/5-2(c) (West 2012). The fact finder "may infer accountability from 'the circumstances surrounding the perpetration of the unlawful conduct,' including 'the defendant's presence during the commission of the offense, the defendant's continued close affiliation with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene.' " *People v. Rebollar-Vergara*, 2019 IL App (2d) 140871, ¶ 102 (quoting *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996)). Accordingly, to prove defendant guilty of the offense as charged here, the State had to prove that either before or during the commission of the offense, and with the intent to promote or facilitate that commission, he solicited, aided, abetted, agreed, or attempted to aid the codefendants in the planning or commission of the offense of aggravated battery based on discharge of firearm. From our review, we find that the evidence overwhelmingly showed that defendant was accountable for the offense of aggravated battery based on discharge of a firearm.

¶ 92     At trial, the State presented evidence of defendant's statement in which he provided details about the night of the shooting and admitted he was involved with the planning and the commission of the shooting where codefendants shot towards a crowd of people and injured a 6-year-old girl and a 52-year-old woman. Specifically, in defendant's statement, he stated that on the night of the shooting, he was with Lynom and Barker and that they saw a group of 10-4Ls down the block "[s]o they decided to go around to the other end of the block and shoot back at the people" who

- 38 -

were having a gathering with about 30 people in front of a house. Defendant stated that Barker and Lynom "volunteered to shoot" and he said he would "go with to make sure [Barker] and [Lynom] were okay." Defendant stated that he stayed at the corner of the alley, after which Barker and Lynom crossed the street and started shooting at the group in front of the house and that, while they were shooting, he "stayed at the edge of the alley to make sure they were okay." He stated that after Barker and Lynom shot their guns, someone fired back at them two times, and they ran back to defendant. Then "they all ran back the same way" until they saw Hardaway, after which they got into the back of his car. At some point, defendant got out the car and went to his grandmother's house, where he changed his clothes because someone had seen him. Defendant also stated that he "did go get the gun, but not on that day."

¶ 93    Defendant's statement regarding his involvement during the commission of the shooting is corroborated by eyewitness testimony. Ayanna Moore testified that on the night of the shooting, she saw three guys, who were wearing red, black, and white shirts, come from an alley, after which the individuals in the red and black shirts ran across the street and started shooting towards the people at the gathering. She identified defendant in court as the person wearing the white shirt and she testified that defendant "came out behind them," "laid back," and stood "off to the side." Ayanna's testimony is corroborated by Thomas's testimony, who testified that when he was at the gathering, he saw two men, who were wearing red and black shirts, walking out of the alley and a third person, whom he identified in court as defendant, wearing a white shirt. He testified that when the individuals in the red and black shirts crossed the street, they started shooting towards the crowd of people and that defendant "[j]ust stand there and look and observe." He also testified that defendant was "kneeling down" and that after the shooting stopped, the men crossed the street

and defendant waited for them and then "stood up, and they all took off in the same direction." Thomas testified that during the shooting, defendant was "[k]neeling by the gate" and "observing the surroundings."

¶ 94    In addition, the State presented evidence of Hardaway's statement after the shooting and his grand jury testimony that corroborated defendant's statement and the eyewitness's testimony regarding defendant's involvement. Hardaway identified a photograph of defendant as the person "who was also part of the shooters" and he stated that after the shooting, he picked up defendant, Lynom, and Barker in his car and let them out. Hardaway testified to the grand jury that when he returned to his grandmother's house after the shooting, he ran into defendant, who had changed his clothes and stated that he threw the guns "back by the train tracks" near a field.

¶ 95    Based on the totality of the evidence showing defendant's presence and involvement with the codefendants before and during the commission of the offense of aggravated battery based on discharge of a firearm, the evidence demonstrating that defendant was accountable was overwhelming and not closely balanced.

¶ 96    Defendant asserts that his statement to the police did not change the fact that the evidence was closely balanced because defendant testified that the statement was coerced by the police, which created a credibility contest as to the veracity of his statement. The jury heard the contents of defendant's statement, defendant's testimony in which he denied the contents of statement and stated his statement was involuntary, and the eyewitnesses' testimony. It was the jury's responsibility to assess the credibility of the witnesses and determine the appropriate weight of the testimony. See *People v. Evans*, 209 Ill. 2d 194, 211 (2004). Further, Ayanna's and Thomas's eyewitness testimony was uncontradicted and corroborated by the contents of defendant's

statement. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 48 ("No 'credibility contest' exists when one party's version of events is unrefuted, implausible, or corroborated by other evidence" and "a fact-finder's need to assess the credibility of a witness where no rival witnesses or other competing evidence was presented does not render the evidence closely balanced").

¶ 97    We are unpersuaded by defendant's reliance on *Sebby*, 2017 IL 119445, ¶ 63, to assert that the evidence was closely balanced because there was a credibility contest. In *Sebby*, our supreme court concluded that the evidence was closely balanced where the State's witnesses' testimony was consistent and so was the defendant's testimony and his witnesses. *Id.* ¶ 61. The court also found that both versions were credible and that neither version was supported by corroborating evidence. *Id.* ¶¶ 61-63. Here, unlike *Sebby*, the State presented evidence of defendant's statement in which he admitted his involvement in the shooting. Further, in *Sebby,* there were two credible and consistent version of events from the State's witnesses and from the defendant and his witnesses. Here, however, defendant asserts that the credibility contest at issue here was between defendant's statement introduced as evidence at trial and his own testimony at trial where he testified his statement was made up and that it was involuntary and dictated by Detective Weber. We find the facts in *Sebby* distinguishable.

¶ 98    Defendant also asserts that the State could not prove that the court's error in violating Rule 431(b) was harmless and that the evidence was not closely balanced because the court had to declare a mistrial on certain counts and the jury sent notes indicating it wanted to review transcripts from the grand jury proceedings and the trial. We are unpersuaded by defendant's arguments.

¶ 99    The jury reached guilty verdicts on two counts of aggravated battery based on discharge a firearm. With respect to the remaining counts, which included attempted murder, the jury was

deadlocked and the court declared a mistrial. We cannot find that the fact that court declared a mistrial on the other counts means that the evidence with respect to aggravated battery based on discharge of a firearm was closely balanced. Further, the fact that the jury sent notes requesting transcripts from the trial and grand jury proceedings does not persuade us that the evidence was closely balanced. See *People v. Cotton,* 393 Ill. App. 3d 237, 260 (2009) (stating "the mere fact that the jury indicated in one note that it could not reach a decision does not render the evidence closely balanced"); *People v. Minniweather*, 301 Ill. App. 3d 574, 580 (1998) (where the defendant contended the jury had a reasonable doubt as to the defendant's guilt because the jury requested to review evidence and asked questions during deliberations, the court found the argument meritless, stating "[t]hat the jury asked for guidance during deliberations merely indicates that the jury took its job seriously and conscientiously worked to come to a just decision"). Moreover, lengthy jury deliberations do not necessarily mean the evidence was closely balanced. See *People v. Nugen*, 399 Ill. App. 3d 575, 584 (2010) ("We reject the general premise a lengthy deliberation necessarily means the evidence is closely balanced.").

¶ 100   Accordingly, defendant has failed to meet his burden of demonstrating that the evidence was closely balanced under the plain error doctrine. Defendant therefore cannot establish plain error.

¶ 101                    C. Trial Court's Comments and "Nonresponsive" Objection

¶ 102   Defendant contends the trial court denied him due process and a fair trial because it conveyed to the jury it had a bias against him by suggesting he had an improper motive during cross-examination. Specifically, defendant asserts that the trial court told the jury that it "did not know what defendant was trying to do with his testimony," which implied that he had an improper

motivation during cross-exanimation. He also states that the trial court, *sua sponte*, told the jury that defendant's mother's answer was "nonresponsive" without an objection from the State, which further showed bias against him. Defendant argues that the court's comments were a material factor in his convictions and likely contributed to the jury's verdict.

¶ 103   In all criminal prosecutions, a defendant is entitled to a fair and impartial trial by jury. *People v. Eckert*, 194 Ill. App. 3d 667, 673 (1990). A trial court "has a duty to see that all persons are provided a fair trial." *People v. Sims*, 192 Ill. 2d 592, 636 (2000). The trial court has wide discretion in presiding over a trial. *People v. Tatum*, 389 Ill. App. 3d 656, 662 (2009). However, a defendant is entitled to a trial that is free from improper and prejudicial comments by the trial judge. *Tatum*, 389 Ill. App. 3d at 662. The trial judge "must refrain from interjecting opinions, comments or insinuations reflecting bias toward or against any party." *Sims*, 192 Ill. 2d at 636. The trial judge "must exercise a high degree of care to avoid influencing the jurors in any way, to remain impartial and to not display prejudice or favor toward any party, due to the judge's great influence over the jury." *Tatum*, 389 Ill. App. 3d at 662.

¶ 104   Improper comments are considered to be "those which reflect disbelief in the testimony of defense witnesses, confidence in the credibility of the prosecution witnesses or an assumption of defendant's guilt." *People v. Williams*, 209 Ill. App. 3d 709, 718 (1991). Further, "a hostile attitude toward a criminal defendant, his witnesses, or his attorney may improperly influence the jury in reaching its verdict, resulting in an unfair trial." *People v. Minter*, 2015 IL App (1st) 120958, ¶ 115. However, even when a trial court makes improper comments, the comments will only constitute reversible error if the remarks were prejudicial, and the defendant was harmed by them. *Tatum*, 389 Ill. App. 3d at 662. It is the defendant's burden to demonstrate prejudice. *People v.*

*Johnson*, 2012 IL App (1st) 091730, ¶ 76. "Even where the court's method of ruling on an objection does indicate an opinion as to the validity of a party's position, the context of the judge's remark may be such that there is no prejudice." *People v. Heidorn*, 114 Ill. App. 3d 933, 938 (1983). Further, if "the comments do not constitute a material factor in the conviction" or if "prejudice to the defendant is not the probable result, the verdict will not be disturbed." *People v. Williams*, 209 Ill. App. 3d 709, 718-19 (1991).

¶ 105    Here, defendant takes issue with two comments made by the trial court: when it stated, "I'm treating you with all the respect I can muster" and that it "did not know what [defendant] was trying to do." The court made the comments during defendant's cross-examination when the State was asking defendant about his statement. Initially, we note that defendant did not object to the first comment at trial or raise the issue in his posttrial motion. However, "given the fundamental importance of a fair trial and the practical difficulties involved in objecting to the conduct of the trial judge, the waiver rule is applied less rigidly when the judge's conduct is the basis for the objection." *Heidorn*, 114 Ill. App. 3d at 936. We will therefore review the merits.

¶ 106    With respect to the first comment, the following colloquy occurred before the remark:

"Q. Well, didn't you tell the Assistant State's Attorney and the detectives that they had never gotten along, that they had been fighting since before you were even involved?

A. You know as well as I know that that statement was dictated by Detective Weber and the State's Attorney.

Q. I don't know that. And we'll go through that.

A. Yes, you do.

THE COURT: Listen. I'm going to warn you once. All right?

- 44 -

THE DEFENDANT: Yes.

THE COURT: You hear me?

THE WITNESS: I understand you, Judge Ford. Yes.

THE COURT: I'm treating you with all the respect I can muster. You're going to listen to the questions— sir, can you pause for a minute. You're going to listen to the questions and answer the ones posed. You can't interject anything into them. Okay. Just listen and answer the questions—"

¶ 107 The second comment occurred later during the cross-examination after the court had sustained numerous objections based on being nonresponsive. Specifically, before the court made the second comment, defendant testified that the detective told him to state that Barker had a gun in his hands, after which the State started asking him a question, "Did Detective Weber" and defendant stated "You're trying to confuse me. You're not going to get—you know as I know that this statement is involuntary." The State objected on the basis of being nonresponsive, after which the court stated:

"Folks, we're going to go over something right now. All of that that he just said, that's not evidence. There was no question pending. It's an effort by the defendant to do, I don't know what. But it's not responsive to the question and he can't do it and you can't consider it. Does everybody understand that?"

The jury responded, "Yes." Thereafter, outside the presence of the jury, defense counsel moved for a mistrial "based upon what you said about what the defendant—you don't know what he's trying to do, but he's trying to do it, for the record."

¶ 108   When the parties returned to the presence of the jury, the court admonished the jury as follows:

> "The defense has pointed out, and I agree, that as I've been talking to [defendant] about what's been going on out here, I indicated that there was a certain—he said, I think, a couple sentences that were really not in response to any question. I want you to understand, he can—that you just can't consider that in any way. I have no knowledge of what—completely what he said because it was nonresponsive, but you can't consider it unless it's a response to a question. Does everybody understand that?"

The jurors responded, "Yes" and then the court stated:

> "That's the long and the short of it. He gets to say whatever he wants. He can be reexamined by his own attorneys if they choose, and they're not required to choose to do so. And the State is also allowed to ask questions that they may ask. That's within their job title also. And that's the purpose of this. But what any witness, and this applies to any of the witnesses that have testified during the course of the trial, has a duty to do is answer the question when posed. That's one of the rules that we've got here. Does everybody understand that?"

The jurors responded, "Yes," and the court continued: "And do you all promise not to consider any remarks that I made as it relates to [defendant's] remarks in any way in reaching whatever verdict you reach?" The jurors responded, "Yes."

¶ 109   Accordingly, the court instructed the jury that it could not consider any remarks the court made as they related to defendant in reaching a verdict, and the jury expressly responded that it promised not to consider any remarks. The jury is presumed to follow the court's instructions and

expressly indicated it would do so. See *People v. Williams*, 2015 IL App (1st) 130097, ¶ 52 ("The jury is presumed to follow the instruction that the court gives it."). Thus, we presume that the jury followed the court's instruction and did not consider any remarks it made that related to defendant. Further, we note that the court sustained several objections based on defendant's answers being nonresponsive and then instructed the jury that it could only consider testimony that was in response to a question.

¶ 110   Further, as previously discussed, the evidence against defendant was overwhelming. Thus, the trial court's remarks could not have played a material role in the jury's verdict. See *People v. Thompson*, 234 Ill. App. 3d 770, 773-74 (1991) (where the reviewing court concluded that the trial court's comment to the jury that "at this particular juncture it is the opinion of the court that the defense will have to move forward in presenting its case" did not constitute reversible error because the evidence supporting the defendants' convictions was overwhelming and the trial court's remark could not have played a material role in the jury's verdict). Viewed in the total circumstances of this case, we find that the court's remarks did not affect the jury's verdict and were not a material factor in the jury's findings. See *Heidorn*, 114 Ill. App. 3d at 938 (the court viewed the court's comments in the total circumstances of the case and found that while the remarks were improper and should not have been made, they had no effect on the jury's verdict and constituted harmless error).

¶ 111   Defendant also asserts that the trial judge showed bias against him when it characterized his mother's testimony as being "nonresponsive" without an objection from the State.[5] Specifically

_____

[5] We note that in defendant's opening brief, he asserts that the trial court told the jury that defendant was being "nonresponsive" on cross-examination without an objection from the State. In defendant's reply brief, he clarifies that appellate counsel erred when it indicated that the court had

- 47 -

defendant cites to the record where the State asked defendant's mother whether she had an "independent memory of what these officers look like?" and she responded, "No. I've been through a lot. My momma passed and my baby had a liver transplant. I've been through a lot these last four years that [defendant] has been in here." The court then stated, "I'm going to sustain that as nonresponsive, folks." We note that a trial judge "is permitted to make rulings without objections from counsel." *People v. Thigpen*, 306 Ill. App. 3d 29, 40 (1999). Further, defendant does not argue or direct us to the record where the court made repeated *sua sponte* objections during defendant's testimony such that it showed bias against him. In addition, given the overwhelming evidence, we cannot find that the court's *sua sponte* nonresponsive objection during defendant's mother's testimony was a material factor in the jury's verdict. See *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 172 (where the reviewing court concluded that the trial court "should not have 'jumped the gun' and should have waited for the state's objection," the court stated "this was an isolated instance and certainly not a material factor in defendant's conviction where the evidence was overwhelming").

¶ 112        D. State's Witnesses' Testimony that Defendant was a "Lookout"

¶ 113   Defendant contends that his right to due process and a fair trial was violated because the trial court allowed Ayanna and Thomas to testify that he was a "lookout" for the shooters. He argues that this was improper opinion testimony and highly prejudicial given the totality of the evidence and because it went to the ultimate issue of whether he was accountable.

¶ 114   Illinois Rule of Evidence 701 addresses testimony of lay witnesses and states as follows:

---

characterized defendant as unresponsive without an objection from the State, because the court did so during the defendant's mother's testimony.

"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill R. Evid. R 701 (eff. Jan 1. 2011).

Rule of Evidence 701 is modeled after Federal Rule of Evidence 701 and, therefore, our supreme court has stated that we may look to federal law as well as state decisions interpreting similar rules for guidance. *People v. Thompson*, 2016 IL 118667, ¶ 40.

¶ 115   Lay witness testimony " 'must be confined to statements of fact of which the witness has personal knowledge.' " *People v. McCarter*, 385 Ill. App. 3d 919, 934 (2008) (quoting *People v. Brown,* 200 Ill. App. 3d 566, 578 (1990)). It must be based on "personal observations and recollections of concrete facts, not on specialized knowledge." *People v. Risper*, 2020 IL App (1st) 160707, ¶ 35. Further, "lay opinion testimony must be relevant to be admissible, like all other evidence." *Id*.

¶ 116   Although a lay witness may not testify as to a legal conclusion at issue, a lay witness may express an opinion on an issue if that opinion will assist the trier of fact. *People v. Richardson*, 2013 IL App (2d) 120119, ¶ 10. Further, a lay witness "may provide an opinion on the ultimate issue in a case." *People v. Terrell*, 185 Ill. 2d 467, 496-97 (1998). "This is so because the trier of fact is not required to accept the witness's conclusion and, therefore, such testimony cannot be said to usurp the province of the jury." *Id*. Further, "[l]ay witnesses also may give opinion testimony about a defendant's mental state, which are not expert opinions, but are 'based on the

witness's perception and that are helpful in understanding the testimony or in determining a fact in issue.' " *United States v. Diaz*, 637 F.3d 592, 600 (5th Cir. 2011) (quoting *United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010)). "Accordingly, as long as this opinion is based on the witness's personal observation, is one that a person is generally capable of making, and is helpful to a clear understanding of an issue at hand, it may be permitted at trial." *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 44.

¶ 117 We review the admission of evidence under an abuse of discretion standard. *People v. Frazier*, 2019 IL App (1st) 172250, ¶ 26. A court is considered to have abused its discretion where the decision is arbitrary, fanciful, unreasonable, or where no reasonable person would agree with the position it adopted. *Id*. From our review of the record, we cannot find that the court abused its discretion.

¶ 118 Defendant takes issue with Ayanna's and Thomas's testimony that defendant was a "lookout." We note that the court sustained several of defense counsel's objections that were based on Ayanna and Thomas using the "word lookout" and instructed the jury that it was the jury's role to determine whether he was a lookout. With respect to Ayanna's testimony, she first used the word "lookout" when she testified that a few days after the shooting she identified defendant in a photo array as the "lookout." However, defense counsel objected "to the word lookout" and the court sustained the objection. Later, Ayanna used the word lookout when she testified that a few days after the shooting she had identified defendant in a lineup as "being a lookout." Although the court overruled defense counsel's objection, when Ayanna used the word lookout again, defense counsel specifically objected "to the word lookout," after which the court instructed the jury as follows:

- 50 -

"Folks, I'm going to take a minute and pause on the word lookout. Whether or not the defendant was a lookout in this case, that's going to be your decision and your decision alone to make. This witness is testifying on her own impressions of what was going on out there. That's something you can consider but the decision of guilt or innocence of the defendant rests solely within you and it's based on your observations of the witnesses. Does everybody understand that?"

The jury responded, "Yes," and then the court sustained the objection "as to the use of the word lookout."

¶ 119 Accordingly, the court sustained two of defense counsel's objections when Ayanna used the word lookout and then instructed the jurors that based on their observations of the witnesses, it was their decision to determine whether he was a "lookout." We must presume the jurors follow the law set forth in the court's instructions and there is nothing to indicate they did not do so. See *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("[a]bsent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them").

¶ 120 Turning to Thomas's testimony, when Thomas testified that defendant was "the shooters lookout," and "[a] lookout basically," the court overruled two of defense counsel's objections. However, after overruling the objections, the court also instructed the jury as follows: "As I've already explained, folks, the role of the parties is for you to determine based on your observations of the witnesses." Although the court overruled defense counsel's objections to Thomas using the word "lookout," the court still reminded the jurors of its instruction that they must determine the parties' roles based on their observations of the witnesses. We must presume the jury followed the

law. We cannot find that the court abused its discretion with respect to its rulings regarding the word "lookout" during Ayanna's and Thomas's testimony.

¶ 121 Further, Ayanna's and Thomas's testimony that defendant was a "lookout" was rationally based on their personal observations and recollections of concrete facts of the shooting. With respect to Ayanna's testimony, before she testified that defendant was a lookout, she testified that when the shooters ran across the street, defendant "came out behind them," "laid back," and stood "off to the side." She also testified that defendant "walked like right behind them and then he looked and walked back" to the alley right before the shooting started. Thomas testified that when the shooters crossed the street, defendant "[j]ust st[ood] there and look[ed] and observe[d]." He testified that there were about 12 to 13 gunshots and defendant was "[s]till standing there" and "kneeling down" and only stood up when they left. He testified that during the shooting, defendant was "observing" and "[o]bserving the surroundings." He believed defendant was "observing" because he "was looking around" towards the people on the block and not towards the shooters.

¶ 122 Applying the principles regarding lay witness testimony discussed above, including Illinois Rule of Evidence 701, we find Ayanna's and Thomas's testimony that defendant was a "lookout" was admissible. Their testimony was relevant, rationally based on their personal observations of defendant and the shooters, and was helpful in determining a fact in issue, *i.e.,* whether defendant either before or during the commission of the shooting, and with the intent to promote or facilitate that commission, solicited, aided, agreed, or attempted to aid codefendants in the planning or commission of the shooting. See *United States v. Diaz*, 637 F.3d 592, 599-600 (5th Cir. 2011) (where the witness testified that the defendant was a "lookout," the court concluded that the "testimony did not rest upon scientific, technical, or specialized knowledge" but rather was an

observation that " 'result[ed] from a process of reasoning familiar in everyday life,' " noting that the witness testified that he saw the defendant "standing in between the trailer and the van, seeing side to side, making sure no vehicles were coming" (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)). Further, the testimony was not based on scientific, technical, or other specialized knowledge. The court did not abuse its discretion when it allowed the witnesses to testify that defendant was a "lookout."

¶ 123                                          E. Sentencing

¶ 124   Defendant next contends that the trial court abused its discretion when it sentenced him to 16 years in prison for each count of aggravated battery based on discharge of a firearm, for a total of 32 years in prison. He argues his sentence is excessive and that the court failed to consider the requisite statutory factors set forth in section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2016)) that a sentencing court must evaluate when sentencing a 17 year old. These factors include the juvenile's background, his ability to consider risks and consequences, peer pressure, the presence of childhood trauma, and the defendant's role in the offense. Defendant requests that we reduce his sentence to the minimum sentence.

¶ 125   Defendant initially asserts that to the extent that he did not properly preserve his challenge because he did not raise the issue in the trial court, we should review his challenge under the plain error doctrine. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("To preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."); *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 150 (where the defendant argued on appeal that the trial court committed plain error because it did not apply section 5-4.5-105 of the Unified Code of Corrections at the sentencing hearing, the reviewing court noted that

the defendant forfeited the issue for appellate review). Defendant is correct that we may review his challenge to his sentences for plain error. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 11. As previously discussed, before we apply the plain error doctrine, defendant must first demonstrate that a clear or obvious error occurred when the trial court resentenced him. *Id.*

¶ 126   A trial court has broad discretionary powers when it imposes a sentence. *People v. Alexander,* 239 Ill. 2d 205, 212 (2010). On review, we give great deference to a trial court's sentencing decision because the trial court observed defendant and the proceedings and is in a better position to consider the relevant sentencing factors. *Id.* at 212-13. The relevant sentencing factors include the defendant's credibility, demeanor, social environment, age, mentality, habits, and moral character. *People v. Vega*, 2018 IL App (1st) 160619, ¶ 60. Other factors include the nature of the crime, the protection of the public, deterrence and punishment, and the defendant's rehabilitative prospects. *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 14. The seriousness of the offense is the most important factor. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Still, the trial court must "impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 8. The trial court is in the best position to find this appropriate balance between protecting society and rehabilitating a defendant. *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005).

¶ 127   We will only modify a sentence if the trial court abused its discretion. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 50. A trial court abuses its discretion when no reasonable person could agree with its position. *People v. Sven*, 365 Ill. App. 3d 226, 241 (2006). When a sentence falls within the prescribed statutory limit, we will not find that a court abused its discretion unless

the sentence is "greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense." *People v. Means*, 2017 IL App (1st) 142613, ¶ 14.

¶ 128 Aggravated battery based on discharge of a firearm is a Class X felony (720 ILCS 5/12-3.05) (West 2016)) with a sentencing range of 6 to 30 years in prison (730 ILCS 5/5-4.5-25(a) (West 2016)). The trial court sentenced defendant to 16 years in prison for each count of aggravated battery based on discharge of a firearm, to be served consecutively, which are terms well within the permissible statutory range. Because defendant's sentences fall within the applicable sentencing range, we presume the sentences are proper. See *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 12 (a sentence that falls within the statutory guidelines is presumed proper).

¶ 129 Nevertheless, defendant asserts that his consecutive sentence of 16 years in prison for each count of aggravated battery based on discharge of a firearm is excessive and that the court failed to consider the relevant statutory factors set forth in section 5-4.5-105(a) of the Unified Code of Corrections. Section 5-4.5-105(a) provides:

> "(a) On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence:
>
> (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 130    Our supreme court has concluded that a trial court's obligation in subsection 5-4.5-105(a) to consider the additional mitigation factors "is temporally limited by 'language in that same subsection.' " *Gunn*, 2020 IL App (1st) 170542, ¶ 152 (quoting *People v. Hunter*, 2017 IL 121306, ¶ 48). This court has found that according to the plain language of subsection(a), the section "applies only to offenses committed on or after the effective date, which was January 1, 2016." *Gunn*, 2020 IL App (1st) 170542, ¶ 153. Here, the offense occurred on July 19, 2013. Because this offense was committed before the effective date, this section did not apply at defendant's sentencing hearing. See *id.* (where the offense occurred on September 20, 2013, the court

concluded that because the offense "was not committed on or after the effective date, [section 5-4.5-105] did not apply at defendant's sentencing"). We note the dissent asserts that in *People v. Buffer*, 2019 IL 122327, where the defendant committed the offense before the statute was enacted, our supreme court held that the factors in section 5-4.5-105 should be applied on remand because the court had previously imposed a *de facto* life sentence. However, here, the trial court resentenced defendant to 32 years in prison, which is not considered a *de facto* life sentence. See *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 63  ("our supreme court has now established that a prison term of "40 years or less" does not constitute a *de facto* life sentence * * *  Since the defendant's sentence is 40 years' imprisonment, it does not constitute a *de facto* life sentence") (citing *People v. Buffer*, 2019 IL 122327, ¶ 41).

¶ 131   To the extent that defendant asserts that his sentence is excessive because the court did not consider the applicable mitigation factors, including those set forth in section 5-4.5-105, we conclude that the trial court did not abuse its discretion when it sentenced him. When mitigation evidence is presented to the trial court, absent some indication to the contrary, we presume that the court considered it. *Sauseda,* 2016 IL App (1st) 140134, ¶ 19. When, as here, a defendant argues that the court failed to consider relevant factors, a defendant must make an affirmative showing that the court did not consider those factors. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. As previously discussed, the relevant factors a trial court considers include the particular circumstances of the case, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Fern,* 189 Ill. 2d 48, 53 (1999).

¶ 132   Defendant has not met his burden of affirmatively showing that the trial court failed to properly consider the relevant mitigating factors. When the court pronounced its sentence, it

expressly stated that it considered the statutory factors in mitigation, the financial impact of incarceration, and the presentence investigation report (PSI), which it reviewed "in its entirety." The PSI contained information about the relevant mitigating factors, including defendant's lack of adult criminal convictions, as well as his social, education, financial, family, health, and psychological histories. Because the court expressly stated that it considered the PSI, we presume the court considered the relevant mitigating factors contained therein, including defendant's age, background, and potential for rehabilitation. See *Burton*, 2015 IL App (1st) 131600, ¶ 38 ("We presume the sentencing court considers mitigation evidence"); *People v. Babiarz*, 271 Ill. App. 3d 153, 164 (1995) ("Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation.")

¶ 133   In addition, the court expressly stated that it considered the evidence offered in mitigation, the attorney's arguments, and defendant's allocution. At sentencing, defense counsel argued that defendant was "just a child," had turned 17 years old just days before the shooting, and never had the opportunity to go to high school because he had been working since he was 15 years old. Defense counsel told the court that defendant had a "tough life," a history of depression in 2011, and tried "to kill himself" when he was 15 years old. Counsel argued that defendant "did not have direction" and "no one to show him the way" and requested that "be factored in greatly" for sentencing. Further, defense counsel read defendant's allocution letter to the court, in which defendant stated, *inter alia*, he was "no longer that reckless 17 year old kid," was "a humble young man evolving into a grown man over time of my incarceration," he was "truly sorry" for what happened, and had learned his lesson. Defendant also told the court that he was "also making a promise to you that if you give me a second chance, you won't regret it" and that "I want to make

something of myself while I still have a chance." We presume the court considered the mitigation evidence that defense counsel presented to the court at the sentencing hearing and nothing in the record indicates otherwise. See *People v. Jackson,* 2014 IL App (1st) 123258, ¶ 53 ("We presume the sentencing court considered mitigation evidence when it is presented.").

¶ 134   Further, at the hearing on defendant's motion to reconsider his sentence, defense counsel argued that defendant had no background, was not the shooter, was only found guilty of aggravated battery with a firearm, and had just turned 17 within days of the offense. Again, we presume the court considered the mitigation evidence that counsel presented. Further, when the court resentenced defendant, it expressly stated that it considered defendant's age, as it stated that it was "mindful of the fact that he is a young person. I've taken that into further account." The court also stated that it did not "often grant motions to reconsider sentences, but this one is one that I continued to mull, even after the sentence had been issued in the case."

¶ 135   Defendant asserts that even though the court was "mindful" of his young age at the time of the offense, "there was no apparent consideration of how the specific factors relative to youth affected a sentence with the object of rehabilitation" and the court did not base its sentence on the particular factors set forth in section 5-4.5-105 of the Unified Code of Corrections. However, the court was not required to recite and assign value to each sentencing factor. *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 16. Nor was it required to articulate the process it used to determine the appropriateness of defendant's sentence. See *People v. Wright*, 272 Ill. App. 3d 1033, 1046 (1995). We may not reweigh the sentencing factors or substitute our judgment for the trial court because we would have weighed the factors differently. *Alexander*, 239 Ill. 2d at 214.

¶ 136 Defendant asserts that the court's original sentence was "based almost exclusively on the injuries caused in the shooting, precluding even a balancing of the proper factors in mitigation" and that the original sentence was based on the nature of the offense, not the particular factors set forth in section 5-4.5-105 of the Unified Code of Corrections. As previously discussed, the seriousness of the offense is the most important factor. *Wilson*, 2016 IL App (1st) 141063, ¶ 11. Further, "[t]here is a strong presumption that the trial court based its sentencing determination on proper legal reasoning." *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 14. It is a defendant's burden to affirmatively establish that the court's sentence was based on improper considerations. *People v. Dowding,* 388 Ill. App. 3d 936, 943 (2009). Defendant does not point us to anything in the record to show that the court improperly considered an aggravating factor when it issued either its original sentence or its amended sentence.

¶ 137 In sum, defendant's consecutive sentences of 16 years in prison for each count of aggravated battery based on discharge of a firearm do not vary greatly with the purpose and spirit of the law. The court therefore did not abuse its discretion when it sentenced defendant.

¶ 138 Lastly, defendant argues in the alternative that to the extent he did not properly preserve his sentencing challenge, his counsel was ineffective for failing to explicitly cite the factors in mitigation set forth in section 5-4.5-105(a) of the Unified Code of Corrections. To prove counsel was ineffective, a defendant must show he was prejudiced by the deficient performance. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 53. An attorney is not considered ineffective for failing to file a motion that has no merit. *People v. Stewart*, 365 Ill. App. 3d 744, 750 (2006). Because we concluded that defendant's sentencing challenges do not have merit, he cannot establish that he was prejudiced when counsel failed to raise section 5-4.5-105 in the trial court.

¶ 139                          III. CONCLUSION

¶ 140   For the reasons explained above, we affirm.

¶ 141   Affirmed.

¶ 142   PRESIDING JUSTICE MIKVA, dissenting in part:

¶ 143   I agree fully with the majority on all issues relating to the findings of Angelo's guilt. However, I would vacate Angelo's sentence and remand this case to the trial court to consider an appropriate sentence in light of the youth-based factors set out in *Miller v. Alabama,* 567 U.S. 460 (2012).

¶ 144   The trial court originally sentenced Angelo to two consecutive sentences of 23 years, for a total of 46 years. Given that Angelo was a juvenile offender, our supreme court would now consider that sentence to be a *de facto* life sentence. It is a violation of the eighth amendment of the United States constitution for a juvenile offender to receive such a sentence, unless the record is clear that the trial court properly and fully considered that individual's youth and its attendant characteristics. *People v. Buffer*, 2019 IL 122327, ¶ 42.

¶ 145   The aggregate 32-year sentence that the court imposed on reconsideration in this case was still 20 years above the minimum sentence. In my view, such a lengthy sentence is at odds with the fact that Angelo was barely 17 at the time of the offense, was the least active participant in the offense, had a troubled background, and had struggled with depression so severe that it had caused him to attempt suicide little more than a year prior to the crime charged.

¶ 146   The majority lays out (*supra* ¶ 129) the specific mitigation factors that now apply to all sentences imposed on individuals who were under the age of 18 at the time of the commission of an offense. 730 ILCS 5/5-4.5-105(a) (West 2016). These include the person's "age, impetuosity,

and level of maturity," their "family, home environment, educational and social background," including "childhood trauma" and the "degree of participation and specific role in the offense." However, the majority takes the view that the trial court was not obligated to consider these factors because the crime for which Angelo was convicted occurred before the effective date of that statute. *Supra ¶* 130. But, because the trial court in this case was reconsidering the originally imposed *de facto* life sentence, I disagree.

¶ 147   In *Buffer,* our supreme court held that the factors set out in section 5-4.5-105 should be applied on remand, although the crime in that case occurred long before the statute was enacted, because the court had previously imposed a *de facto* life sentence.  The *Buffer* court noted, when it remanded the case to the trial court for resentencing, in 2019, on a crime committed sometime before 2010: "Further, the parties correctly agree that defendant is entitled on remand to be sentenced under the scheme prescribed by section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016))." 2019 IL 122327, ¶ 47.

¶ 148    In support of this conclusion, the *Buffer* court cited its earlier reasoning in *Holman*, where it had noted that "consideration of the *Miller* factors is consistent with section 5-4.5-105 of the Unified Code of Corrections, which now requires the trial court to consider factors taken from the Supreme Court's list." *People v. Holman*, 2017 IL 120655, ¶ 45. The *Holman* court went on to conclude, "[b]ecause *Miller* is retroactive," that "*all juveniles*, whether they were sentenced after the statutory amendment became effective on January 1, 2016, or before that, should receive the same treatment at sentencing." (Emphasis added.) *Id.*

¶ 149   While the majority in this case correctly points out (*supra ¶* 130) that the jail term before us now is not a *de facto* life sentence, Angelo was in the same position as the defendant in *Buffer*.

In *Buffer* our supreme court instructed the trial court, when it resentenced the defendant, to consider, "under the scheme prescribed by section 5-4.5-105" (*Buffer*, 2019 IL 122327, ¶ 47), the appropriate sentence for a juvenile offender who had been given a 50-year *de facto* life sentence. Here, the trial court's task, when it had before it the defendant's motion to reconsider the sentence, was, quite similarly, to consider the appropriate sentence for a juvenile offender who had been given a 46-year *de facto* life sentence. At that point, the "scheme prescribed by section 5-4.5-105" became applicable. I note that even the State, in its response brief in this case, does not suggest that the factors set out in section 5-4.5-105 were inapplicable in this case. Rather, it argues that Angelo failed to rebut the presumption that these factors were considered.

¶ 150   It is also clear to me that the trial court did not, in fact, consider these factors when it resentenced Angelo. As the majority's opinion makes clear, not all courts view these factors as applicable, where the crime was committed before the effective date of section 5-4.5-105. The trial court made no mention of the factors themselves. Nor did it ever reference Angelo's limited role in this shooting, the fact that he was unarmed, his limited criminal background, that he was one week past his seventeenth birthday or that he suffered from depression. All the court said that in any way referenced the factors laid out in *Miller* or in section 5-4.5-105 was: "I'm mindful of the fact that he was a young person." That is woefully insufficient to suggest that the relevant factors were considered here. I would remand to give the trial court the opportunity to apply those factors and sentence Angelo as the juvenile that he was when this tragic crime occurred.

¶ 151   I respectfully dissent, in part, for the reasons stated.